**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALFRED MURPHY,<br><br>                              Petitioner,<br><br>v.<br><br>RAYMOND MADDEN,<br><br>                              Respondent. | Case No.: 21-cv-1600-LAB-DDL<br><br>**ORDER:**<br><br>**(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS. [Dkt. 1]; and**<br><br>**(2) DENYING CERTIFICATE OF APPEALABILITY** |

## I.    INTRODUCTION

Petitioner Alfred Murphy, a state prisoner, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or "Pet."), challenging his San Diego Superior Court conviction in case number SCE359335. (*See* Dkt. 1 at 1).[1] The Court has reviewed the Petition and Memorandum of Points and Authorities in Support of the Petition, (Dkt. 1, 1-2), the Answer and Memorandum of Points and Authorities in Support of the Answer, (Dkt. 8, 8-1), the lodgments, the

---

[1] Page numbers for the Petition, Answer, Memorandum of Points and Authorities in Support of the Answer and Traverse cited in this Order refer to those imprinted by the Court's electronic case filing system.

Traverse, (Dkt 10), and all the supporting documents submitted by both parties. For the reasons discussed below, the Court **DENIES** the Petition and **DENIES** a certificate of appealability.

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Murphy may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35–36 (1992) (holding findings of historical fact, including inferences properly drawn from those facts, are entitled to statutory presumption of correctness). The California Court of Appeal[2] summarized the facts as follows:

> The Prosecution Case
>
> On March 19, 2016, Prince Brown, a long-haul truck driver from Texas, checked into a motel room in El Cajon. [Danielle] Dumont was standing with Brown when he checked into the motel and had her own suitcase. Dumont later claimed that whenever Brown was in San Diego, he would spend time with her. After Brown checked into room 234, he talked by phone with a friend in Texas and sent a photograph of himself and Dumont in the room. Within an hour after Brown and Dumont entered room 234, Murphy was seen entering room 226.
>
> The strongest evidence at trial revealing the defendants' involvement in Brown's murder was the motel's security camera video footage. The footage showed Dumont and another unidentified woman coming in and out of room 234 on the night of March 19, but Brown never left the room. Throughout the night and the next morning, Dumont was also seen going into other rooms at the motel and talking with other individuals, later identified as including Murphy and Smith.
>
> The next morning, about two hours before Brown's murder, Murphy was seen on the video footage walking

---

[2] Murphy's appeal was consolidated with those of his co-defendants, Dumont and Smith. (*See* Dkt. 9-50, Resp't Lodgment 9 at 3 n.2).

around the motel with an object under his shirt at hip level. An expert later opined the item was consistent with the shape of a firearm and that Murphy was carrying the object in the same manner that a person would carry a firearm. Around the same time, Dumont and the unidentified woman reentered room 234, Brown's room. Approximately one hour before Brown's murder, the other woman left room 234 and never returned.

At about 9:30 a.m., Dumont left room 234 and met with Smith at room 226, Murphy's room. The two entered the room. Shortly thereafter, Dumont walked out, holding a cell phone in one hand and a keycard in her other hand. She was wearing a dress; the video showed no bulges in the dress, suggesting she was not concealing a firearm or other object.

Dumont rejoined Brown, who was alone in room 234. Murphy slowly followed Dumont down the hall, while Smith remained behind watching Murphy. As Murphy approached Brown's room, Smith made a knocking motion in the air with his hand. Murphy, now wearing gloves, responded by knocking on the door of the room next to room 234. Following the knock, Murphy reached across his body to his hip, where he was still carrying an object consistent with the shape of a gun hidden under his shirt. When no one answered, Murphy walked back down the hall toward Smith. Murphy then walked toward Brown's room but stopped in front of the wrong door again. Before he knocked, Smith motioned toward him and Murphy moved to room 234, Brown's room. Murphy then entered room 234 at 9:35 a.m., joining Dumont and Brown inside.

At approximately the same time, the friend Brown had called the evening before received an incoming call from Brown. The friend testified that when he answered, Brown did not respond and the friend heard only silence. The friend then heard a woman say something with an angry tone, a male voice saying, "shut up," and then a gun shot.

The security camera footage showed Murphy running out of room 234 a little under a minute after he

entered. As he ran down the hall, Murphy was holding onto the area around his belt buckle and clutching what appeared to be paper money in his other hand. Murphy then left the motel.

Seconds after Murphy's exit, Dumont left Brown's room carrying several bags with her and headed to room 226. Shortly before Dumont's arrival at room 226, Smith left that room and carried bags previously in the possession of Murphy down to the parking lot. He then returned to the hallway outside room 226 to wait for Dumont.

Dumont reappeared from room 226 in a new set of clothes and the two returned to the hallway outside room 234. Smith and Dumont appeared to be trying to open the window and door of room 234. [Footnote 3: The police later found women's clothing and cell phones inside Browns room, suggesting Dumont locked herself out of the room after the murder and was attempting to get back in to clear the room of her possessions.] In another attempt to get back inside the motel room, Dumont put on sunglasses and a glove and attempted to break the window of room 234 with an object wrapped in a towel. After she failed to break the window, Dumont and Smith carried some bags down to the parking lot, got into a car together, and drove away.

Several hours later, a housekeeper found Brown's body in room 234. Brown had been shot in the back of his head, later revealed to be by a gun near or against his head. His wound was consistent with being shot while he was on his hands and knees.

During a search of the room, the police found items scattered around, including both male and female clothing, two cell phones, a large box of condoms, an opened condom wrapper, and a copper jacketing for a bullet. No gun, wallet, or paper money was found in the room.

Several weeks later, motel staff found Brown's wallet in the motel's laundry room, where it was found inside a plastic bag marked with a notation that it came from room 226 (the same room Dumont entered after leaving Brown's room immediately after the murder).

Subsequent DNA testing of the items found in Brown's room identified Dumont as a likely contributor to the DNA found on one of the cell phones. DNA found on Brown's wallet also matched Dumont. A genital swab taken from Brown's body also picked up DNA that matched Dumont.

At trial, a confidential informant testified that while he was in custody, Smith told him about the crime. Smith told the informant that "the girl" went into the room to get money from the "trick," her male customer, but when Smith sent "his boy" into the room to rob the man, the man "came up dead." Smith did not name the "girl" or the "boy." [Footnote 4: At trial, Smith attempted to undermine the credibility of the informant with testimony from a retired prosecutor who opined that the informant received a reduced sentence based on his testimony. The District Attorney presented evidence disputing the claim that the informant received favorable treatment.]

The jury also heard evidence about a prior incident where a man hired Dumont for sex at a casino, but she ran out of the room with his money.

The Defense Case

Of the three defendants, only Murphy testified in his own defense. At trial, he claimed that he went to the motel on the night before the murder to sell methamphetamine. He later ran into Smith, who was his girlfriend's cousin. On the morning of Brown's murder, Murphy testified that he gave Dumont drugs without payment after Smith vouched for her. He later went to collect payment from Dumont, claiming he first put on gloves "for intimidation purposes." According to Murphy, he went into room 234 to collect the money but saw a body on the ground, so he quickly grabbed some money off a nightstand and fled. Murphy denied having a gun and denied being involved in Brown's murder.

Dumont did not testify but called witnesses to testify that she had an existing relationship with Brown, but was not previously associated with Murphy or Smith before the night of the murder.

1  (Dkt. 9-50, Resp't Lodgment No. 9 at 4–8, *People v. Dumont*, No. D074163 (Cal.
2  Ct. App. Apr. 21, 2020)).

3  **III.   PROCEDURAL BACKGROUND**

4          On September 1, 2016, the District Attorney filed an Information charging
5  Murphy and his two co-defendants, Dumont and Smith, with murder under
6  California Penal Code § 187(a). (Dkt. 9-6, Resp't Lodgment No. 1 ("Clerk's Tr.")
7  vol. 6 at 1242–43). The Information also alleged that Murphy personally
8  discharged a firearm causing great bodily injury, Cal. Penal Code § 12022.53(d),
9  and that Murphy had suffered a violent felony prison prior, § 667.5(a), and a prior
10  strike conviction, §§ 667(b)–(i), 1179.12. (Clerk's Tr. vol. 6 at 1243–44).

11         Following a jury trial, Murphy was found guilty of first-degree murder, and
12  the jury found the firearm allegation to be true. (Dkt. 9-10, Clerk's Tr. vol. 9,
13  at 2301; *see also* Dkt. 9-37, Resp't Lodgment No. 2 ("Rep.'s Tr.") vol. 21
14  at 2876–79). In a bifurcated bench trial, the court found the violent felony prison
15  prior and the strike prior allegations to be true. (Dkt. 9-10, Clerk's Tr. vol. 9
16  at 2302–03; Dkt. 9-38, Rep.'s Tr. vol. 21 at 2894–95). The trial court sentenced
17  Murphy to 25 years-to-life for the murder conviction and 25 years-to-life for the
18  firearm enhancement, to run consecutively, plus an additional 5-year term for the
19  prior serious felony enhancement, for a total sentence of 50 years-to-life, plus five
20  years. (Dkt. 9-10, Clerk's Tr. vol. 9 at 2316).

21         Murphy appealed his conviction to the California Court of Appeal. (*See*
22  Dkt. 9-44, Resp't Lodgment No. 3). On appeal, Murphy argued the trial court erred
23  in failing to sever his trial from his co-defendants' and in admitting testimony of an
24  expert witness regarding Murphy's possession of a gun. (*See id.*). The appellate
25  court affirmed his conviction on April 21, 2020. (*See* Dkt. 9-50, Resp't Lodgment
26  No. 9). Murphy then filed a petition for review with the California Supreme Court,
27  raising the same issues. (*See* Dkt. 9-51, Resp't Lodgment No. 10). The court
28  denied his petition without comment or citation on June 24, 2020.

(Dkt. 9-52,Resp't Lodgment No. 12).

Murphy filed his federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on September 23, 2021. (Dkt. 1, Pet.). Respondent filed an Answer and Memorandum of Points and Authorities in Support on January 12, 2022. (Dkt. 8, 8-1). Murphy filed a Traverse on January 24, 2022. (Dkt. 10, Traverse).

## IV.   SCOPE OF REVIEW

Murphy's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 326–29 (1997). Under AEDPA, a habeas petition will not be granted unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court isn't called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002).

The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991). If the dispositive state court order doesn't "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000), *overruled on other grounds by Andrade*, 538 U.S. at 75–76; *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]," the state court decision will not be "contrary to"

clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

## V.   DISCUSSION

Murphy's Petition raises two claims. First, he argues the failure to sever his trial amounted to a violation of his right to due process and his right to confront witnesses against him. (Dkt. 1-2 at 18–25). Second, Murphy argues his due process rights were violated when the trial court permitted an expert to give improper testimony. (*Id.* at 32–37).

### A.   Severance

In his first claim Murphy argues the failure to sever his trial from that of his co-defendants violated his right to due process rights because the three defendants had antagonistic defenses. (Dkt. 1-2 at 13–25). He also contends his right to confrontation[3] was violated by the failure to sever his trial because a jailhouse informant was permitted to testify as to statements made by Murphy's co-defendant, Smith, who didn't testify at trial. (*See id.*)

### 1.   State Court Opinion

Murphy raised this claim in his petition for review to the California Supreme Court, which was denied without comment or citation. (Dkt. 9-51, 9-52, Resp't Lodgment Nos. 11, 12). Because there is no reasoned opinion from the state high court, this Court must look through to the last reasoned state court decision to address the claim. *See Ylst*, 501 U.S. at 805–06. Here, that is the opinion of the California Court of Appeal. In denying the claim, the appellate court stated:

"'The applicable law is settled. The Legislature has

---

[3] In his Petition, Murphy raises this claim under both the Due Process and Confrontation Clauses. (*See* Dkt. 1-2 at 13, 18–19). In his Traverse, however, Petitioner states he is proceeding "now with only the due process violation." (*See* Dkt. 10 at 4 n.1). The Court will nonetheless address both bases for relief as to this claim.

expressed a preference for joint trials; therefore, two or more defendants jointly charged with crimes must be tried together unless the court orders separate trials. (Pen. Code, § 1098; [Citations].) Joint trials promote efficiency and help avoid inconsistent verdicts. [Citations.] "[I]mportant concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against [the] ensuing charges." [Citation.] The court has discretion to order separate trials if there is an incriminating confession, prejudicial association, likely confusion due to evidence on multiple counts, conflicting defenses, or the possibility that a codefendant might provide exonerating testimony at a separate trial. [Citation.] Prejudicial association might exist if "the characteristics or culpability of one or more defendants [is] such that the jury will find the remaining defendants guilty simply because of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue." [Citation.] We review the court's denial of severance for abuse of discretion based on the facts as of the time of the ruling. If the court properly denied severance at the time, the reviewing court may reverse a judgment only if it finds that the joint trial caused gross unfairness that denied due process. [Citations.]'" (*People v. Anderson* (2018) 5 Cal.5th 372, 386–387.)

"When defendants are charged with having committed 'common crimes involving common events and victims,' as here, the court is presented with a 'classic case' for a joint trial." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40.) Simply because the defenses may be antagonistic does not compel severance. "'"If the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.'" [Citation.]' [Citation.] Instead, antagonistic defenses support severance 'only where the acceptance of one party's defense precludes the other party's acquittal.' [Citations.] If the moving party's guilt can be established by sufficient independent evidence, 'it is not the conflict alone that demonstrates . . .

21-cv-1600-LAB-DDL

guilt,' and severance is not required. [Citations.]" (*People v. Winbush* (2017) 2 Cal.5th 402, 456.)

Joint trials may also be inappropriate when the prosecution seeks to introduce a statement by a non-testifying codefendant implicating another defendant. Where a defendant's prior statement is facially incriminating of the codefendant, it generally may not be admitted at a joint trial, even with a limiting instruction, unless it is properly sanitized. (*Bruton, supra*, 391 U.S. at pp. 135–136; *Aranda, supra*, 63 Cal.2d at p. 530; *People v. Capistrano* (2014) 59 Cal.4th 830, 874, overruled on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104.) However, "'"this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial."'" (*Capistrano*, at p. 869.)

*Bruton* was expressly premised on a defendant's Confrontation Clause rights. (*Bruton*, *supra*, 391 U.S. at pp. 126–128.) "The Confrontation Clause of the Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' In *Crawford v. Washington* [(2004) 541 U.S. 36], [the United States Supreme Court] held that this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' A critical portion of this holding . . . is the phrase 'testimonial statements.' Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. [Citation.] It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (*Davis v. Washington* (2006) 547 U.S. 813, 821; accord, *People v. Hopson* (2017) 3 Cal.5th 424, 431.) If the statement in question is nontestimonial hearsay, the *Bruton* court's confrontation clause analysis is inapplicable. (See, e.g. *People v. Cortez* (2016) 63 Cal.4th 101, 129; *Almeda, supra*, 19 Cal.App.5th at pp. 362-363.) [Footnote 7: We apply only *Bruton* here

21-cv-1600-LAB-DDL

because "[t]o the extent *Aranda* 'require[d] the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the "truth-in-evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)).' (*People v. Fletcher* (1996) 13 Cal.4th 451, 465)" (*People v. Almeda* (2018) 19 Cal.App.5th 346, 362, fn. 5 (*Almeda*).)]

It is well established that statements to a cellmate in an informal setting, even when that cellmate acts as an informant by later providing information to law enforcement about the defendant's statements, are not testimonial. (*Almeda, supra*, at pp. 362-363; see also *Davis v. Washington*, supra, 547 U.S. at p. 825 [statements from one prisoner to another, made unwittingly to an informant, are "clearly nontestimonial"].) If a statement is non-testimonial, "'it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule.'" (*People v. Arceo* (2011) 195 Cal.App.4th 556, 573.)

C. Analysis

Dumont and Murphy contend the trial court abused its discretion in finding that separate trials were not necessary because their defenses were not sufficiently antagonistic to warrant severance. This argument lacks merit.

We agree Murphy's and Dumont's defenses are antagonistic to the degree they intended to place blame on the other, but this is not the type of case where only one defendant could be found guilty. Indeed, the jury could have accepted Dumont's argument that she was not involved in the scheme between Smith and Murphy while also accepting Murphy's argument that the evidence was insufficient to support his guilt. Although the jury concluded otherwise and found all three defendants guilty, nothing in the evidence presented or arguments made by any party required the jury to find that the innocence of one defendant required finding another defendant guilty.

As Dumont concedes, no California court has reversed a conviction on the basis that antagonistic

defenses compelled severance of the codefendants' trials. This is not the case to break new ground. "'"Mutual antagonism" only exists where the acceptance of one party's defense will preclude the acquittal of the other.'" (*People v. Hardy* (1992) 2 Cal.4th 86, 168.) Here, although the jury rejected all of the defendants' defenses, it was possible for the jury to accept one of the defenses and still acquit the other defendants. As such, the trial court did not abuse its discretion in declining to sever the trials on this basis.

Additionally, the trial court did not violate Murphy's rights under the Confrontation Clause by allowing the informant's testimony regarding Smith's statements in the joint trial. Because Smith's statements to the informant were not testimonial, the Confrontation Clause has no application in this context. (*Almeda, supra*, 19 Cal.App.5th at pp. 362-363 [statements to cellmate serving as informant are not testimonial].)

(Dkt. 9-50, Resp't Lodgment No. 3 at 14–19, *People v. Dumont*, No. D074163 (Cal. Ct. App. Apr. 21, 2020)).

## 2. Federal Law and Analysis

Murphy argues the state court's denial of his severance claim was unreasonable application of clearly established law regarding due process and the confrontation clause. As for the due process aspect of Murphy's claim, it fails. First, and most significantly, the state court's decision denying relief couldn't have been contrary to, or an unreasonable application of, clearly established federal law because there is no clearly established federal law regarding the misjoinder of co-defendants by a state court. *See Runningeagle v. Ryan*, 686 F.3d 758, 774 (9th Cir. 2012) ("[T]here is no clearly established federal law requiring severance of criminal trials in state court even when the defendants assert mutually antagonistic defenses."); *see also Grajeda v. Scribner*, 541 F. App'x 776, 778 (9th Cir. 2013) ("The Supreme Court has not held that a state or federal trial court's denial of a motion to sever can, in itself, violate the Constitution.")

(unpublished).

Next, Murphy's citation to *United States v. Lane*, 474 U.S. 438 (1986), is misplaced. (*See* Dkt. 1-2 at 21; Dkt. 10, Traverse at 5). Although the Supreme Court in *Lane* observed in a footnote that "misjoinder would rise to the level of a constitutional violation . . . if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial," *Lane*, 474 U.S. at 446 n.8, the Ninth Circuit has held that the Court's statement is dicta and, therefore, doesn't constitute clearly established law for purposes of federal habeas review. *See Runningeagle*, 686 F.3d at 776–77; *Collins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010) (stating footnote 8 in *Lane* "did not set forth the governing legal principle . . . . It was merely a comment."); *Carey v. Musladin*, 549 U.S. 70, 74 (2006) ("[C]learly established Federal law" in § 2254(d)(1) refers to the holdings, as opposed to the dicta, of this Court's decisions."). Similarly, in *Zafiro v. United States*, 506 U.S. 534 (1993), the Supreme Court held federal district courts should grant severance "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. But the Ninth Circuit has subsequently ruled that *Zafiro* analyzed "only the Federal Rules of Criminal Procedure applicable to federal district courts" and, therefore, wasn't binding on state courts. *See Collins*, 603 F.3d at 1131–32 ("By its own wording, *Zafiro* only applies to federal and not state court trials."); *see also Hedlund v. Ryan*, 854 F.3d 557, 571 (9th Cir. 2017) ("*Zafiro* does not apply to § 2254 cases."). Thus, neither *Lane* nor *Zafiro* established clear Supreme Court authority upon which Murphy can rely for federal habeas relief. Indeed, there is simply no "constitutional standard binding on the states and requiring severance in cases where defendants present mutually antagonistic defenses." *Collins*, 603 F.3d at 1131. Therefore, Murphy isn't entitled to relief as to the due process portion of his claim.

Turning to the Confrontation Clause aspect of Murphy's claim, it also fails.

Murphy argues the failure to sever his trial resulted in the denial of his clearly established right to confront witnesses against him—in this case, Smith, who purportedly made incriminating statements to an informant. (Dkt. 1-2 at 13, 18). Murphy cites to both *Bruton v. United States*, 391 U.S. 123 (1968), and *Crawford v. Washington*, 541 U.S. 36 (2004). (Dkt. 1-2 at 13). In *Bruton*, the Court held that, in a joint trial, the Confrontation Clause is violated by the admission of a non-testifying defendant's confession which incriminates a codefendant. *Bruton*, 391 U.S. at 137. But *Bruton* must be viewed through the lens of the Court's decision in *Crawford*, where the Court held that the Confrontation Clause applies to statements which are "testimonial." *Crawford*, 541 U.S. at 68 (2004). Indeed, the Ninth Circuit has held that "[o]nly testimonial codefendant statements are subject to the federal Confrontation Clause limits established in *Bruton*." *Lucero v. Holland*, 902 F.3d 979, 987 (9th Cir. 2018). In short, if the statement isn't testimonial, neither *Crawford* nor *Bruton* apply.

A statement is testimonial if it is "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51–52; *United States v. Rojas-Pedroza*, 716 F.3d 1253, 1267 (9th Cir. 2013) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009)). In contrast, out-of-court statements made "with a primary purpose other than possible prosecutorial use" are generally not testimonial. *United States v. Solorio*, 669 F.3d 943, 953 (9th Cir. 2012). Here, Smith made his statements to the confidential informant ("CI")[4] while they were both being held at the county jail. (*See* Dkt. 9-29, Rep. Tr. vol. 13 at 1558–59). Unwitting statements to a government informant or "from one prisoner to another" aren't testimonial because they lack the formality "essential to a testimonial

---

[4] The informant's name was redacted from the trial transcripts. (*See* Dkt. 9-29, Rep.'s Tr. vol. 13 at 1477).

21-cv-1600-LAB-DDL

utterance" and aren't made for the "primary purpose" of establishing facts relevant to a criminal prosecution. *Davis v. Washington*, 547 U.S. 813, 825, 830 n.5 (2006); *see also, e.g.*, *Garnett v. Morgan*, 330 F. App'x 671, 672–73 (9th Cir. 2009) (noting that statements to a friend, casual remarks to an acquaintance, and statements made unwittingly to an informant aren't testimonial); *United States v. Saget*, 377 F.3d 223, 229 (2d Cir. 2004) ("[A] declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*."); *United States v. Watson*, 525 F.3d 583, 589 (7th Cir. 2008) (same); *United States v. Udeozor*, 515 F.3d 260, 270 (4th Cir. 2008) (same); *United States v. Underwood*, 446 F.3d 1340, 1347 (11th Cir. 2006) (same); *United States v. Hendricks*, 395 F.3d 173, 182–84 (3d Cir. 2005) (same). Obviously, Smith wouldn't have shared what he did had he known the CI was going to pass the information on to law enforcement. Viewed objectively, a reasonable person would find a conversation between Smith and the CI more akin to "causal remark[s] to an acquaintance" than a formal declaration to a government official. *See Crawford*, 541 U.S. at 51. Therefore, the statements weren't testimonial. And as a result, the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established law.[5]

---

[5] Even if the state court's denial of the claim was objectively unreasonable, Murphy wouldn't be entitled to habeas relief because any error was harmless. For a federal habeas writ to issue, a petitioner must demonstrate "actual prejudice" by showing the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Here, the testimony of the CI didn't directly implicate Murphy. And, importantly, the jury was specifically instructed that the CI's testimony "was admitted only against defendants Dumont and Smith." (Dkt. 9-3, Clerk's Tr. vol. 3 at 768). Furthermore, the CI testified only that Smith told him that he sent his "boy" into the motel room to commit a robbery and "when the [prostitute] went into the room to get the money, somehow the trick came up dead." (Dkt. 9-29, Rep.'s Tr. vol. 13

1
2
3
4
5
6
7
8
9
10
11
12
13

Finally, to the extent Murphy argues that admission of the inculpatory statements made by Murphy's co-defendant to a jailhouse informant rendered his trial fundamentally unfair in violation of his due process rights, his claim also fails. (*See* Dkt. 1-2 at 18–20; Dkt. 10, Traverse at 5–6). Without clearly established law holding that a failure to sever a state trial can violate federal due process, Murphy can't obtain relief. Indeed, this Court is prohibited from finding that the state court's adjudication of Murphy's severance claim was contrary to, or involved an unreasonable application of, clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1), even if Murphy could demonstrate that the failure to do so resulted in a fundamentally unfair trial. *See White v. Woodall*, 572 U.S. 415, 426 (2014) ("[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.") (quoting *Yarborough*, 541 U.S. at 666).

14
15
16
17
18
19
20

For the above reasons, the state appellate court's denial of Murphy's severance claim was neither contrary to, nor an unreasonable application of, clearly established federal law. *See Andrade*, 538 U.S. at 72; *Williams*, 529 U.S. at 412–13; 28 U.S.C. §2254(d)(1). Murphy isn't entitled to relief as to Claim One.

//

//

21
22
23
24
25
26
27
28

---

at 1558–59). The CI didn't identify Murphy as the "boy" or Dumont as the prostitute. (*See id.*). It was the surveillance video which showed Dumont entering the room, followed by Murphy. (Dkt. 9-26, Rep.'s Tr. vol. 10 at 1026, 1030–31). The video depicted Murphy reaching for an object at his hip as he entered the room. (Dkt. 9-27, Rep.'s Tr. vol. 11 at 1266–67). Immediately thereafter, the victim's friend heard a gunshot over the phone, along with male and female voices. (Dkt. 9-24, Rep.'s Tr. vol. 8 at 590–91). After the shooting, Murphy and Dumont fled the scene. Murphy appeared to have cash in his hand as he fled. (Dkt. 9-26, Rep.'s Tr. vol. 10 at 1055–56, 1070). Given the other evidence presented at trial, Murphy hasn't shown the CI's testimony had a substantial injurious effect on the verdict. *See Brecht*, 507 U.S. at 637.

**B.    Expert Testimony**

Murphy contends his due process rights were violated when the trial court permitted prosecution expert Grant Fredericks to offer expert opinion testimony regarding surveillance video footage. (Dkt. 1-2 at 32–37). Specifically, Fredericks testified that in his opinion, the video depicted Murphy carrying an object that was consistent with the size, shape, and movement of a handgun. (*Id.* at 33). Murphy contends this rendered his trial fundamentally unfair because it concerned a subject that was within the common knowledge of ordinary jurors and as such, Frederick's testimony improperly intruded on the jury's factfinding role. (*Id.* at 35).

**1.    State Court Opinion**

Murphy raised this claim in his petition for review to the California Supreme Court. (Dkt. 9-51, Resp't Lodgment No. 10). The petition was denied without comment or citation, (Dkt. 9-52, Resp't Lodgment No. 11), so this Court must look through to the last reasoned opinion from the state court—that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805–06. In denying Murphy's claim, the appellate court stated, in relevant part:

> [There are] two requirements for the admissibility of expert testimony: (1) the subject matter of the testimony must be sufficiently beyond common experience to assist the trier of fact and (2) the testimony must be based on a proper matter, either personal knowledge or any other matter upon which experts in the field may reasonably rely. (See *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371.) "Expert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness." (*People v. Torres* (1995) 33 Cal.App.4th 37, 45.)
>
> "A trial court's decision to admit expert testimony is reviewed for abuse of discretion." (*People v. Lindberg* (2008) 45 Cal.4th 1, 45.)
>
> Murphy asserts that Fredericks's testimony that Murphy was carrying an object consistent with a firearm on

21-cv-1600-LAB-DDL

his hip was inadmissible because a jury viewing the same video footage could have reached the same conclusion just as intelligently as Fredericks did. He concedes Fredericks's expertise as a former law enforcement officer supports the conclusion that he "had some specialized knowledge and experience concerning what a concealed firearm looks like and how someone carries a concealed firearm." But Murphy maintains Fredericks's opinion testimony was inadmissible because an ordinary juror could review the video footage without any expertise and determine whether Murphy was carrying a gun.

The People rely on *People v. Singleton* (2010) 182 Cal.App.4th 1 (*Singleton*), to support their contention that Fredericks's testimony was admissible. In *Singleton*, a police officer was charged with assaulting an arrestee. (*Id*. at p. 5.) At trial, the police officer testified that his use of force was justified to restrain the arrestee because he lost control while transporting him. (*Id*. at p. 10.) A retired police officer offered opinion testimony in support of the prosecution's case, opining that video footage showed the defendant in control of the arrestee throughout the incident, contradicting the defendant's testimony. (*Ibid*.) Defendant argued the officer's testimony was inadmissible because he simply viewed the video footage and offered testimony about what it depicted, a matter not beyond the common experience of the jurors. (*Id*. at pp. 20-21.) The appellate court disagreed, explaining that the officer "did not merely describe the video recording images, but interpreted them as an experienced police officer." (*Id*. at p. 21.)

Here, Fredericks's testimony bears a resemblance to the expert's testimony in *Singleton*. Fredericks did not merely describe Murphy's actions and appearance captured by the security cameras; he interpreted the video by comparing different frames and explaining how the images support an inference that Murphy was carrying an object consistent with a handgun and how Murphy's gait, combined with the images suggesting an object in the shape of a gun, bolstered that conclusion. An ordinary juror may have experience watching videos, but such a jurors [sic] experience in watching relatively low-quality security

1
2
3
4
5
6
7
8
9

camera footage to ascertain whether a person is concealing a handgun in his waistband is sufficiently beyond the common experience of the jurors such that Fredericks's testimony would likely assist a jury. The trial court, which has ample experience considering the ability of jurors, did not exceed the bounds of reason in permitting Fredericks to testify. Seeing no error under California's evidentiary law, we likewise conclude Murphy's federal due process claim based on the same claim of error necessarily fails. (*People v. Riccardi* (2012) 54 Cal.4th 758, 809-810 [the "routine and proper application of state evidentiary law does not impinge on a defendant's due process rights"].)

10
11

(ECF No. 9-50 at 21–26, Resp't Lodgment No. 9, *People v. Dumont*, No. D074163 (Cal. Ct. App. Apr. 21, 2020)).

12

## 2.   Federal Law and Analysis

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Claims based on state evidentiary rulings aren't cognizable on federal habeas unless the ruling is alleged to have violated federal law, either by infringing on a specific federal constitutional or statutory provision or by depriving the defendant of a fundamentally fair trial, as required by the Due Process Clause. *Estelle v. McGuire*, 502 U.S. 62, 70–73 (1991); *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996); *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999) "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  "Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id*. (citation omitted). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *See Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). While adherence to state evidentiary rules suggests that the trial was conducted in a

procedurally fair manner, it is possible to have a fair trial even when state standards are violated. *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983).

Fredricks's testimony didn't render Murphy's trial fundamentally unfair. The videos of the activity outside of Brown's room prior to his murder were highly relevant, as was Fredricks's testimony about the videos. Despite its relevance, Murphy contends his due process rights were violated by Fredricks's testimony because Fredericks invaded the province of the jury by testifying as to an "ultimate issue," in this case, that the size and shape of the object at Murphy's left hip, in combination with Murphy's movement's related to the object (i.e., the cross-draw) were consistent that of a concealed handgun. (*See generally* Dkt. 9-26, Rep.'s Tr. vol. 9 at 995–1000). The Ninth Circuit has stated, however, that it has found no cases "support[ing] the general proposition that the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact." *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009); *Scribner v. Briceno*, 555 F.3d 1069, 1077 (9th Cir. 2009) (rejecting claim that expert's testimony that hypothetical robberies were gang-related was unconstitutional because "there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue"); *see also Duvardo v. Giurbino*, 410 F. App'x 69, 70 (9th Cir. 2011) (noting that the Supreme Court "has never held that the admission of expert testimony on an ultimate issue to be resolved by the trier of fact violates the Due Process Clause"); *Waggoner v. Hernandez*, 393 F. App'x 449, 452 (9th Cir. 2010) ("To the extent that Waggoner is [arguing] that the expert's testimony invaded the province of the jury, Waggoner fails to cite any United States Supreme Court case holding that an expert may not offer an opinion regarding the ultimate issue to be decided by the trier of fact."). Absent such "clearly established Federal law," the state appellate court's denial of the claim can't be an unreasonable application of federal law. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (stating that where the Supreme Court's cases give no clear

answer to the question presented, state court's rejection of a petitioner's habeas claim didn't constitute an unreasonable application of clearly established Federal law).

Finally, Petitioner's reliance on *Maurer v. Dep't of Corr.*, 32 F.3d 1286 (8th Cir. 1994), is misplaced for two reasons. (Dkt. 1-2 at 35). First, *Maurer* isn't binding on this Court. Second, it's easily distinguishable. In *Maurer*, the issue was improper vouching for the victim's credibility, not expert testimony. *Maurer*, 32 F.3d at 1289. Specifically, the trial court in *Mauer* allowed four witnesses to testify that the victim's allegations of criminal sexual conduct were credible and during closing argument, the prosecutor repeatedly emphasized the witnesses' opinions that the victim was sincere. *Id.* at 1289–90. Here, Fredricks didn't testify as to the credibility of other witnesses and the prosecutor didn't vouch for Fredricks's testimony (or anyone else's) during closing argument. Given the stark difference between *Maurer* and this case—as to both the facts and the legal issue—Murphy's reliance on *Mauer* unpersuasive. *See White*, 572 U.S. at 426 ("[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.").

In sum, absent relevant clearly established law, under either the Due Process Clause or Confrontation Clause, the state appellate court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. *See Andrade*, 538 U.S. at 72; *Williams*, 529 U.S. at 412–13; 28 U.S.C. §2254(d)(1). Murphy isn't entitled to relief as to Claim Two.

## VI.   CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny a certificate of appealability. *See* 28 U.S.C. § 2254, Rule 11(a). The district court may issue a certificate of appealability if the petitioner has made a

substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy this standard, a petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, given the lack of clearly established law, the Court finds Murphy has failed to make "a substantial showing of the denial of a constitutional right," and reasonable jurists wouldn't find debatable this Court's assessment of his claims. *See id.* Accordingly, a certificate of appealability is **DENIED**.

## VII.   CONCLUSION

Based on the foregoing, the Court **DENIES** the petition for writ of habeas corpus, and **DENIES** a certificate of appealability.

**IT IS SO ORDERED**.

Dated:  June 6, 2023

**Hon. Larry Alan Burns**
United States District Judge